RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0301P (6th Cir.)
File Name: 00a0301p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

—————————

FAMILY SAFETY PRODUCTS,
INC., a Michigan Corporation,
f/k/a Therm Acquisition, Inc.,
                *Plaintiff-Appellant,*

         *v.*

VISTA 2000, INC., a Delaware
Corporation; and FAMILY
SAFETY PRODUCTS, INC., a
Georgia Corporation,
             *Defendants-Appellees.*

No. 99-1646

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
Nos. 97-01028; 98-00709—Robert Holmes Bell,
District Judge.

Argued: May 5, 2000

Decided and Filed: September 7, 2000

Before: MERRITT, CLAY, and CUDAHY,[*] Circuit
Judges.

—————————

[*]The Honorable Richard D. Cudahy, Circuit Judge of the United
States Court of Appeals for the Seventh Circuit, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:**   Frank H. Johnson, BORRE, PETERSON, FOWLER & REENS, P.C., Grand Rapids, Michigan, for Appellant.  Robert E. Jones, PRIOR & JONES, Madison, Georgia, for Appellees.  **ON BRIEF:**  Frank H. Johnson, BORRE, PETERSON, FOWLER & REENS, P.C., Grand Rapids, Michigan, for Appellant.  Robert E. Jones, PRIOR & JONES, Madison, Georgia, for Appellees.

_____

**OPINION**

_____

   CUDAHY, Circuit Judge.  In 1996, Therm Acquisition sought to purchase the substantial business assets of one of Vista 2000's wholly-owned subsidiaries, Family Safety Products, Inc.[1]  Family Safety, a Georgia corporation, manufactured carbon monoxide detectors and other household products.  As indicated, Family Safety was a wholly-owned subsidiary of Vista 2000, Inc. (a Delaware Corporation); sometime in early 1996, Therm Acquisition was formed under the laws of Michigan for the purpose of purchasing the assets of Family Safety.  Negotiations proceeded until the terms of the Asset Purchase Agreement were finalized, and on August 27, 1996, Therm Acquisition purchased substantially all the assets of Family Safety for $4,634,410.   Therm paid $1,800,000 cash at the closing, provided a promissory note in the amount of $100,000 (which was payable to Family Safety

_____

[1] After the asset purchase, Therm Acquisition was renamed Family Safety Products, Inc., and sued under its new name.  For the sake of clarify, we will refer to the plaintiff as Therm Acquisition throughout and will use the name "Family Safety" to designate the defendant Georgia corporation, which was a wholly-owned subsidiary of Vista 2000, whose assets Therm bought.

Ala. Code § 6-5-101, Therm's innocent misrepresentation claim fails as well. A plaintiff suing for an innocent misrepresentation must be able to show that its reliance on the misrepresentations was reasonable under the circumstances. *See Mahoney v. Forsman*, 437 So. 2d 1030, 1033 (Ala. 1983) ("Where a party has reason to doubt the truth of the representation . . . he has no right to act thereon."). It is undisputed that Therm was aware of Family Safety's then-recent financial difficulties and irregularities. Additionally, given the language of § 4.11 of the Asset Purchase Agreement, Therm was clearly on notice that the amounts stated by Family Safety were not necessarily absolutely correct but were instead accurate only to Family Safety's "best knowledge." Any reliance on exact dollar amounts in this context was unreasonable. Therefore, we agree with the district court that Family Safety was entitled to summary judgment on Therm's accounts-receivable claims.

In sum, the district court was correct to find against Therm on its breach of warranty and fraud claims, and we AFFIRM that portion of the decision. However, we believe that the district court improperly granted summary judgment against Therm on its prepaid insurance premium claim. Therefore, we REVERSE that portion of the decision and REMAND for trial on that issue.

on August 27, 1997) and assumed liabilities in the amount of $2,743,410.

After the deal closed, some disputes arose. First, Family Safety failed to deliver prepaid insurance premiums on policies it had canceled prior to the asset sale. Family Safety had apparently canceled the policies after a representative of Therm Acquisition informed it that Therm was not going to use the liability insurance, instead opting for new policies issued at a lower premium. Therm Acquisition believed, however, that, under the terms of the Asset Purchase Agreement, it was entitled to the prepaid premiums, even though it was not going to use the insurance. Family Safety disagreed with Therm Acquisition's interpretation of the Agreement and refused to turn over the funds. (Instead, Family Safety retained the refunded premiums and used them to repay the secured creditor that had originally financed the purchase of the insurance.)

A second dispute arose over the accounts receivable that Therm Acquisition acquired from Family Safety. Prior to the purchase, Therm Acquisition had been aware that a former executive of Family Safety had been involved in falsifying financial information. Perhaps as a result of this knowledge, Therm Acquisition required that the accounts receivable be identified both by debtor and by amount owed on a schedule attached to the Asset Purchase Agreement. After concluding the asset purchase, Therm Acquisition attempted to collect the accounts receivable, but it found that the dollar amounts stated in the schedule attached to the Agreement were badly misstated, sometimes by tens of thousands of dollars. When time came for Therm to pay the $100,000 promissory note, it refused to do so, and following some fruitless negotiations, the present lawsuits were filed.

Therm Acquisition filed suit in the Western District of Michigan, alleging that Family Safety and Vista 2000 had breached the Asset Purchase Agreement and committed conversion by withholding the prepaid insurance premiums.

Therm also alleged that variances in the accounts receivable violated the Agreement's warranties and constituted fraudulent (or innocent) misrepresentation. Family Safety and Vista 2000 filed counterclaims in the Michigan action. Shortly thereafter, Family Safety and Vista 2000 filed their own lawsuit against Therm in the Northern District of Georgia.   They claimed that Therm Acquisition had wrongfully failed to pay the $100,000 promissory note and had breached certain conditions of the Asset Purchase Agreement. (These claims were substantially similar to their counterclaims in Therm Acquisition's Michigan case.) Therm Acquisition's motion in Georgia for change of venue was granted, and the two cases were consolidated in the Michigan district court.

Therm Acquisition moved for summary judgment on its breach of contract and breach of warranty claims. Family Safety and Vista 2000 also moved for summary judgment—against all counts of Therm's complaint and on their counterclaims.   The district court denied Therm Acquisition's motion but granted Family Safety's and Vista 2000's motion in its entirety, thereby dismissing Therm's lawsuit and sustaining liability against Therm on Family Safety's promissory note and breach of contract claims. (The issue of damages was left open.)   Therm Acquisition appealed.

We review the district court's decision to grant summary judgment against Therm Acquisition *de novo. See Thompson v. Williamson County, Tennessee*, No. 99-5458, 2000 WL 973414, at *2 (6th Cir. July 7, 2000).  Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."   FED. R. CIV. P. 56(c).   In deciding summary judgment, we view the evidence and must draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Therm Acquisition challenges only the district court's determinations that Family Safety is entitled to

## II.  ACCOUNTS RECEIVABLE

Therm Acquisition's second claim is much more easily resolved.  Therm claims that Family Safety made an express warranty as to the value of the accounts receivable by assigning a dollar value to each account on Schedule 1.1(c), which was attached to the Asset Purchase Agreement. But, even assuming that Schedule 1.1(c) created an implied warranty with respect to the value of the accounts receivable, the scope of that warranty was defined by Article IV of the Asset Purchase Agreement, labeled REPRESENTATIONS AND WARRANTIES OF THE SELLER.  Section 4.11 of Article IV states that "[t]o the best knowledge of [Family Safety], no representation or warranty made by [Family Safety] in this Agreement *or in any other Schedule referenced herein* . . . contains any untrue statement of material fact . . . ."  J.A., vol. 1 at 33 (emphasis added).  The effect of § 4.11 is to render any warranty—express or implied—created by the schedule of accounts receivable satisfied so long as Family Safety made the statements to its "best knowledge," *i.e.* in good faith.  As the district court properly noted, Therm has presented no evidence that Family Safety (or Vista 2000) knew that the amounts reported on Schedule 1.1(c) were incorrect, so under the terms of the Asset Purchase Agreement, Therm must lose this argument.[3]

But Therm also argues that the inaccuracies in Schedule 1.1(c) were fraudulent misrepresentations. However, as noted earlier, Therm has produced no evidence that Vista knew the accounts receivable schedule to be incorrect or acted recklessly.  Therefore, Therm's fraudulent misrepresentation claim fails. *See* Ala. Code § 6-5-101. *See also Patel v. Hanna*, 525 So.2d 1359 (Ala. 1988).  Therm also argues that misrepresentations simply made by mistake and innocently are actionable under Alabama law.  Although this is true, *see*

---

[3] Also, the district court properly noted that Therm's recourse for inaccurate reporting of the accounts receivable is through the purchase price modification scheme § 2.2 of the Asset Purchase Agreement.

Agreement).  The district court took this lack of disclosure as "additional evidence that the prepaid insurance was not intended as an Asset to be transferred."  The lack of disclosure might illuminate Family Safety's lack of intent, but it does little to clarify Therm's expectations or the scope of the Asset Purchase Agreement.

Further, the district court dismissed the strongest piece of evidence supporting the inclusion of the prepaid insurance premiums as merely a "vague reference."  Although it may be a trifle convoluted, the Asset Purchase Agreement's reference to prepaid insurance premiums as an exception to the "excluded assets" is far from vague.  It is instead strong evidence that Therm and Family Safety intended to *include* prepaid insurance premiums among the assets to be transferred to Therm.  Given the clear reference to prepaid insurance premiums (which is rendered ambiguous by the absence of prepaid premiums from any schedule of assets) and the conflicting inferences that can be drawn from the extrinsic evidence, we do not believe that this issue is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  *See also Whitetail Dev. Corp. v. Nickelson*, 689 So.2d 865, 867 (Ala. Civ. App. 1996) ("Ambiguity in a contract precludes the trial court from entering a summary judgment.").  Therefore, we reverse the district court's decision to grant summary judgment with respect to the prepaid insurance premiums.[2]

---

[2]Therm also claims that Vista converted the unpaid insurance premiums.  To show conversion, Therm must demonstrate "a wrongful taking [or] an illegal assumption of ownership . . . ." *Huntsville Golf Dev., Inc. v. Ratcliff, Inc.*, 646 So. 2d 1334, 1336 (Ala. 1994).  Thus, the resolution of this claim depends on the resolution of the contract question. If Therm did not own the prepaid premiums, then Vista could not have converted them.

summary judgment on Therm's prepaid insurance premium and accounts receivable claims.  We address each of these claims in turn, applying the substantive law of Alabama, as specified in the Asset Purchase Agreement's choice-of-law provision.  *See*, *e.g.*, *Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir. 1998).

## I. PREPAID INSURANCE PREMIUMS

Therm Acquisition claims that it purchased the unpaid insurance premiums under the plain terms of the Asset Purchase Agreement.  Therm points to the broad language of the sales clause, arguing that it is unambiguous evidence that the prepaid insurance premiums were part of the purchase. Article I, section 1.1 of the Agreement states, in pertinent part

> [Family Safety] shall sell and transfer to [Therm Acquisition] . . . all of [Family Safety]'s rights, title and interest in and to *all of the assets* and properties of [Family Safety] employed or held in connection with the Business, except for the Excluded Assets (as defined below)

J.A., vol. 1 at 24 (emphasis added).  Therm argues that this section could not be clearer.  "*[A]ll* of the assets" means what it says: *all* of the assets.  The prepaid insurance premiums were, says Therm, an asset of Family Safety, and thus fell within the scope of § 1.1 of the Asset Purchase Agreement. Therm finds even better evidence that the prepaid insurance premiums were part of the purchase by looking to the definition of "Excluded Assets" in § 1.2 of the Agreement, which provides:

> the following assets, rights and properties shall be specifically excluded from the transactions contemplated by this Agreement (the "Excluded Assets"):
>
> . . .
>
> (d) all prepaid charges, sums and fees *other than prepaid insurance premiums*. . . .

J.A., vol. 1 at 25 (emphasis added). Thus, prepaid insurance premiums are quite clearly excepted from the Excluded Assets, and the import of this is that prepaid insurance premiums were part of the purchase, concludes Therm. Based on the above, Therm argues that the contract on this point is "unambiguous" and that not only did the district court err by granting summary judgment in favor of Family Safety, but the district court also erred by not granting summary judgment in favor of Therm.

Were the Asset Purchase Agreement the only pertinent document, Therm Acquisition would have a very strong argument.  But, as Family Safety points out, there are numerous schedules attached to and referenced in the Asset Purchase Agreement, and we must take these documents into account when construing the Agreement. *See In re Phelps v. Dan Tucker Auto Sales, Inc.* 718 So.2d 33, 36 (Ala. 1998) ("Other writings, or matters contained therein, which are referred to in a written contract may be regarded as incorporated by the reference as a part of the contract and[,] therefore, may properly be considered in the construction of the contract.") (quotation omitted). *See also ANCO TV Cable Co., Inc. v. Vista Communications Ltd. Partnership I*, 631 So.2d 860 (Ala. 1993); *K & C Development Corp. v. AmSouth Bank, N.A.*, 597 So.2d 671, 674 (Ala. 1992). The prepaid insurance premiums are not listed on any of the schedules of assets, and Family Safety argues that their absence indicates that they were *not* meant to be transferred as part of the asset sale.  As the district court correctly noted, the reference to prepaid premiums as an exception to the excluded assets matched with the failure to specify them on any of the asset schedules renders the Asset Purchase Agreement ambiguous under Alabama law. *See*, *e.g.*, *Voyager Life Ins. Co., Inc. v. Whitson*, 703 So.2d 944, 948 (Ala. 1997) ("When any aspect of a contract is capable of more than one meaning, it is ambiguous.").  Therefore, the district court properly denied Therm's motion for summary judgment.  We are, however, less convinced of the propriety of granting summary judgment in favor of Family Safety.

Because the contract is ambiguous, we may properly consider extrinsic evidence in determining the intent of the parties and the scope of the Asset Purchase Agreement. *See Rime Shatten Dev. Co. v. Birmingham Cable Communications, Inc.*, 569 So.2d 332, 334 -35 (Ala. 1990). In deciding that Therm was not entitled to the prepaid premiums as a matter of law, the district court relied on two pieces of extrinsic evidence.  First, a couple of days before the closing, Vista 2000's general counsel—who was negotiating the asset sale on behalf of Family Safety—asked Therm's primary negotiator whether Therm intended to use the prepaid insurance policies.  Therm replied that it did not but would be using its own, less expensive, insurance instead.  Second, the district court noted that because Family Safety had fully financed the purchase of the insurance policies and the financier held a 100 percent security interest in the policies, the prepaid policies had zero net value.  Based on these two pieces of evidence, together with the fact that the prepaid premiums were not listed as an asset on any schedule, the district court concluded that the unambiguous intent of the parties was *not* to transfer the prepaid insurance premiums to Therm.  This is certainly one plausible conclusion that could be drawn from the evidence, but we do not believe that it reaches the level of certitude required for summary judgment.

Therm's statement to Vista 2000's general counsel that it was not going to "use" the policies can support the inference that Therm did not want the policies as part of the asset purchase.  But, this is not the only supportable inference that can be drawn from Therm's statement. Drawing the inference in favor of Therm, as we are required to do in considering summary judgment, *see Matsushita*, 475 U.S. at 587, this statement equally supports Therm's intent to receive the insurance, cancel it, and collect the refund of the prepaid premiums.  The fact that there was a security interest on the policies—which gave the insurance policies a zero net value in the hands of Family Safety—does not undermine this inference because Family Safety did not disclose the security interest to Therm (as required by the Asset Purchase