INTERCORP, INC., Plaintiff–Appellee,

v.

PENNZOIL COMPANY,
Defendant–Appellant,

Pennzoil Products Company, A Division
of Pennzoil Company, Defendants.

INTERCORP, INC., Plaintiff–Appellee,

v.

PENNZOIL COMPANY,
Defendant–Appellant.

Nos. 88–7069, 88–7120.

United States Court of Appeals,
Eleventh Circuit.

July 25, 1989.

Lewis W. Page, Jr., Lange, Simpson, Robinson & Somerville, Birmingham, Ala., for defendant-appellant.

Victor L. Hayslip, Bradley, Arant, Rose & White, Jere F. White, Jr., Hobart A. McWhorter, Jr., Birmingham, Ala., for Intercorp, Inc. in both cases.

William W. Smith, Birmingham, Ala., for Intercorp, Inc. in case no. 88–7120.

Before RONEY, Chief Judge, HATCHETT, Circuit Judge, and HENDERSON, Senior Circuit Judge.

PER CURIAM:

Pennzoil Company and Pennzoil Products Company, a division of Pennzoil Company (collectively "Pennzoil") appeal from a jury verdict awarding Intercorp, Inc. ("Intercorp") damages for breach of contract and fraud. Although Pennzoil challenges the district court's denial of several motions and the court's jury instructions, we find no error and accordingly affirm the jury's award.

### FACTS

In early 1983, following extensive negotiations and the corresponding production of several draft contracts, Intercorp and Pennzoil entered into an Export Distributor Sales Agreement (the "contract" or "agreement") under which Pennzoil agreed to sell its products to Intercorp for distribution in certain areas of the Caribbean basin. Included in Intercorp's "Area of Primary Responsibility" ("area" or "territory") were the U.S. Virgin Islands, the Dominican Republic, and the island of Tobago, but not, according to the final agreement, the Republic of Tobago and Trinidad.

Prior to executing the final agreement, Intercorp, concerned about the contract's grant of a "nonexclusive right" to market Pennzoil's products in the distributor's territory, had attempted to have that provision changed to reflect an "exclusive" distributorship. Pennzoil had responded that its legal department eschewed the use of the term "exclusive" in Pennzoil's distributorship agreements, fearing that the resulting relationships might run afoul of federal antitrust laws. To mollify Intercorp's lingering reservations, Pennzoil had explained that its policy was to treat its distributorship agreements as being exclusive in nature and to protect its distributors' areas of primary responsibility.

Pursuant to the agreement, Intercorp began marketing Pennzoil products throughout the Caribbean basin, including the island of Trinidad. Because the island had been listed in earlier drafts of the distributorship contract, Intercorp regarded Trinidad as being a part of its area. The evidence suggested that Pennzoil understood Trinidad to be in Intercorp's area as well. One of its agents testified at the trial that the failure to include Trinidad in the final agreement may have been a typographical error. In any event, the undisputed testimony disclosed that Intercorp acted in good faith when moving into Trinidad, checking with Pennzoil before proceeding to market its products.

In December, 1983, Intercorp discovered that a dealer called Faisal's Gems & Gift Centre, Ltd. was marketing Pennzoil products in Trinidad under an agreement with another Pennzoil distributor, Industria Americana. Intercorp contacted Pennzoil about this problem and was told that Pennzoil would take care of the situation. Pennzoil assured Intercorp that Trinidad was included in its territory. Also late in 1983, Intercorp learned about another Pennzoil distributor operating in its geographical area. That distributor, Don Luis Auto Sales, was selling Pennzoil products under a distributorship agreement which assigned it an area including the Dominican Republic and the Virgin Islands. When Intercorp became aware of this territorial

overlap, it notified Pennzoil. Pennzoil confirmed that the Dominican Republic and the Virgin Islands were in Intercorp's assigned territory.

But Pennzoil had blundered, and soothing reassurances could not continue to calm its disgruntled distributors. After Faisal's Gems sued Pennzoil, Pennzoil, by a letter dated June 27, 1984, advised Intercorp that it would "postpone assignment of distribution rights to Trinidad until [our attorneys] can sort out the facts." Intercorp interpreted this to mean that Trinidad was not within its area of responsibility under the distributorship agreement. The relationship deteriorated, and in March, 1986, Pennzoil unilaterally deleted a number of markets—including the Bahamas, Jamaica, Bermuda and Tobago—from Intercorp's area.

## PROCEDURAL HISTORY

On May 9, 1986, Intercorp sued Pennzoil for breach of contract and fraud.[1] Pennzoil answered and filed a counterclaim seeking compensatory damages for past-due invoices. The case proceeded to trial in the United States District Court for the Northern District of Alabama in June, 1987. During the trial, Pennzoil moved to have the distributorship agreement rescinded, alleging that Intercorp's agents together with a Pennzoil employee had conspired to defraud Pennzoil through a kick-back scheme. The district court severed Pennzoil's equitable claim. On June 12, 1987, the jury returned a general verdict for Intercorp, awarding both compensatory and punitive damages. The district court directed a verdict in favor of Pennzoil on its counterclaim, awarding compensatory damages on the past-due invoices. After the trial, the district court found in favor of Intercorp on Pennzoil's claim for equitable rescission. Pennzoil appeals from these adverse judgments.

## CONTENTIONS

At the trial, Intercorp contended that Pennzoil had breached the distributor agreement by, among other things, (1) failing to recognize that Intercorp's territorial rights included the island of Trinidad and (2) assigning to other distributors the right to market Pennzoil products in Trinidad, the Virgin Islands and the Dominican Republic, thus violating an oral agreement between the parties that Intercorp would be the only distributor of Pennzoil's products within its assigned area. Pennzoil argued that the agreement, which had been reduced to writing and executed by the parties on March 21, 1983,[2] unambiguously granted Intercorp a "nonexclusive right to sell and distribute Pennzoil products," and that conspicuously absent from the written contract was any mention of Trinidad.

Because Intercorp's claims concerning Trinidad and the nature of the distributorship ("exclusivity") rested wholly or in part upon prior written draft agreements, oral representations and other extrinsic evidence, Pennzoil relied upon the parol evidence rule in an effort to prevent Intercorp from offering such evidence to contradict the terms of the written agreement. Pennzoil complains that the trial court allowed the jury to consider all the evidence—including the parol evidence proffered by Intercorp—as bearing on the parties' "true agreement." Intercorp counters that the extrinsic evidence was properly admitted before the jury, because the writing was not intended by the parties to contain a complete statement of their agreement. Intercorp additionally claims that the so-called fraud exception to the parol evidence rule rendered the rule inoperative in this case. Thus, according to Intercorp, the barrier of the parol evidence rule was never erected.

---

**1.** Intercorp's complaint contained seven counts: (1) breach of contract; (2) wrongful termination and bad faith breach of contract; (3), (4) negligent or intentional misrepresentation, fraudulent concealment and promissory fraud; (5) restitution; (6) interference with business and contractual relations; and (7) unfair and deceptive trade practices. Only the claims for breach of contract and the several types of fraud were submitted to the jury. The other counts are, therefore, not at issue on appeal.

**2.** The contract is dated January 10, 1983.

## DISCUSSION

Unfortunately, special interrogatories were not propounded to the jury, nor were the verdicts designated by separate counts. Consequently, the verdict does not specify the issues on which Intercorp prevailed, and which, if any, were decided in Pennzoil's favor. The award of punitive damages indicates that the jury found Pennzoil was guilty of some type of fraud. However, the jury also may have awarded compensatory damages on the breach of contract claims. "Constructed as it was, the general verdict was a favorable finding on either one or both of these theories." *E.L. Cheeney Co. v. Gates*, 346 F.2d 197, 200 (5th Cir.1965). As a result, "[i]f a significant error in the charge was made ... on either of the two theories, the mystery, being impenetrable compels a reversal." *Id.* Hence, a crucial question is whether the district court properly applied the parol evidence rule.

In reaching a resolution of this issue, we must first determine whether this action is subject to the provisions of the Uniform Commercial Code ("UCC" or the "Code") or the common law of contracts. Pennzoil says the UCC applies, a statement Intercorp denies. Both agree that, in either event, Alabama law governs.

Alabama has enacted the UCC, codifying it at Title 7, Code of Alabama. The relevant portion, Article 2 of the UCC—Sales, is found at sections 7–2–101 through 7–2–725. Article 2 "applies to transactions in goods." § 7–2–102. The Code defines the term "goods" broadly to mean "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." § 7–2–105(1). Clearly, Pennzoil products are goods within the UCC's definition. The Code does not define "transaction," but

section 7–2–106 specifies that for Article 2 purposes the terms "agreement" and "contract" "are limited to those relating to the present or future sale of goods." Thus, the UCC governs this case if the distributorship agreement is a contract for the sale of goods.

Whether a distributorship agreement constitutes a transaction in goods is a question that the Alabama Supreme Court recently considered. In *Thermal Systems of Alabama, Inc. v. Sigafoose*, 533 So.2d 567 (Ala.1988), the plaintiff distributor, Thermal Systems ("Thermal"), entered into several written agreements with Thermo Conducting Systems ("Thermo Conducting"), a company which manufactured a product patented by the owner of Thermo Conducting, Sigafoose. The contracts granted Thermal an exclusive distributorship for a territory covering the entire states of Alabama and Florida. Under these agreements, no other entity, including Sigafoose, could market Sigafoose's invention, called a Go–Between, in Thermal's territory. Subsequently, Sigafoose sold Thermo Conducting's assets to a third party, and thereafter the exclusivity of Thermal's distributorship decayed. Thermal brought an action for breach of contract against Thermo Conducting, Sigafoose and others. The trial court granted summary judgment in favor of the defendants, on the grounds that the contracts were unenforceable due to uncertainty—they contained no stated term of duration—or lack of mutuality of obligation. *Id.* at 568–69. The Supreme Court of Alabama reversed, holding that the contracts were valid under the provisions of that state's version of the UCC. *Id.* at 571. The contract at issue in the instant case is sufficiently analogous to those in *Sigafoose* to convince us that under Alabama law, the UCC applies to this action.[3]

---

**3.** In *Sigafoose*, the court relied upon section 7–2–306(2) in ruling that the contracts were not void for lack of mutuality. *Id.* That section relates to contracts for "exclusive dealing" in goods, and it provides that "unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale [shall be implied]." Thus, it could be argued that the

court's decision to apply the UCC in that case turned on the fact that, unlike the contract here, the agreements there by their terms created an exclusive distributorship. The court gave no indication that the expressly exclusive nature of the distributorship was outcome determinative on the choice of law issue. Indeed, the court did not discuss that particular issue at all. We decline to hold that the dispositive factor in

Most courts further support this conclusion. The predecessor of this court so held in *Corenswet, Inc. v. Amana Refrigeration, Inc.*, 594 F.2d 129, 134 (5th Cir.), *cert. denied*, 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979), explaining that "[a]lthough most distributorship agreements, like franchise agreements, are more than sales contracts, the courts have not hesitated to apply the Uniform Commercial Code to cases involving such agreements." *See 3 Bender's UCC Service (Duesenberg–King)* § 4.08[3], at 4–291 (1988) (including as an example of a term which would be clearly contradictory, and thus not admissible under the Code's parol evidence rule, "a claim of exclusivity in an expressly non-exclusive distributor contract, or the converse.").

Moreover, the distributorship agreement by its terms suggests that the parties envisioned a buyer/seller relationship. Article I, paragraph 1 of the contract provides, "PENNZOIL agrees to sell to [Intercorp]" Pennzoil products. Likewise, Article II, paragraph 1 states:

> During the term of this Agreement, DISTRIBUTOR shall purchase and PENNZOIL shall sell to DISTRIBUTOR Pennzoil Products in such quantities that DISTRIBUTOR will have a full line of such products on hand at all times to meet the requirements of its trade. DISTRIBUTOR shall place orders for Pennzoil Products in approximately equal monthly quantities subject to reasonable seasonal variations.

These provisions bring this "requirements" contract squarely within the scope of § 7–2–306(1), which deals with both "output" and "requirements" contracts. Finally, Article III, paragraph 8 of the contract declares that "[t]he relationship between the parties is that of vendor and vendee and not a principal and agent." Accordingly, we hold that this action is subject to the provisions of the UCC, with the Alabama common law of contracts supplementing the Code to the extent that particular statutory provisions do not displace the common law principles. See § 7–1–103.

Section 7–2–202 contains the Code's version of the parol evidence rule:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
>
> (a) By course of dealing or usage of trade (section 7–1–205) or by course of performance (section 7–2–208); and
>
> (b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The UCC plainly distinguishes between "final" expressions of agreement and "complete and exclusive" statements of agreement between the parties, statutory counterparts to the common law concepts of partial and complete integration.[4] The

---

determining whether the UCC controls a distributorship agreement is whether the contract grants an exclusive distributorship. By according undue significance to section 7–2–306(2), such a rule would allow the tail to wag the dog.

**4.** According to one commentator,

Finality means merely that the writing is final as far as it goes. It cannot be contradicted but there is no bar to the proof of additional consistent terms. Exclusive means that the writing was intended as the memorial of the total agreement. As the writing states 'everything' it necessarily follows that a term not included in the writing cannot be proven by parol evidence, without regard to whether the

term could be considered consistent with the writing.

Of necessity, 'exclusive' also embraces 'finality.' A determination that a particular writing is the exclusive statement of the agreement of the parties necessarily implies that it is the final statement of that agreement. In contrast with the incomplete final writing that can be supplemented by proof of unwritten terms, the exclusive writing cannot be supplemented by proof of any term, as the writing is the total agreement and excludes any supplementation.

2 Anderson, Uniform Commercial Code § 2–202:21, at 146 (3d ed. 1982) (footnote omitted).

completeness of a written contract is entirely a function of the parties' intent.

Under the Code, whether the parties intended that their writing be the final expression of their agreement is a question for the trial court to decide.[5] *United States Federal Corp. v. Commercial Mechanical Contractors, Inc.*, 707 F.2d 1124, 1127 (10th Cir.1982); *Luria Brothers & Co. v. Pielet Brothers Scrap Iron & Metal, Inc.*, 600 F.2d 103, 109 (7th Cir.1979); *Sylvania Electric Products, Inc. v. United States*, 458 F.2d 994, 1006–07 (Ct.Cl.1972); *3 Bender's UCC Service, supra*, § 4.08[3], at 4–286. Similarly, Alabama common law places upon the trial judge the duty to resolve, as a matter preliminary to the introduction of extrinsic evidence to contradict or vary the terms of a written agreement, the issue of the parties' intent to adopt the writing as a complete and integrated statement of their agreement. E.g., *Hibbett Sporting Goods v. Biernbaum*, 375 So.2d 431, 435 (Ala.1979); *Port City Const. Co., Inc. v. Henderson*, 266 So.2d 896, 899 (Ala.Civ.App.1972) ("The provisions of section 2–202 ... do not depart from the law of contracts as it existed prior to the adoption of the Commercial Code."); *cf.* Restatement (Second) of Contracts § 210(3) (1981). Thus, the trial court properly may receive extrinsic evidence "until it is determined by the court that the writing was intended as the final and complete contract of the parties." 2 Anderson, *supra*, § 2–202:21, at 146. However, such evidence initially bears on this single issue only. Therefore, extrinsic evidence may not be considered by the fact finder (the jury in this case) to contradict the written terms unless the court first decides that the parties did not intend the writing to be a final or complete contract. E.g., *Hibbett Sporting Goods*, 375 So.2d at 436.

 Intercorp contends that its allegations of fraud opened the door to the admission of extrinsic evidence, a door which thereafter could not be closed by the parol evidence rule. It relies on the fraud exception to the parol evidence rule, a judge made exception which remains good law under the Code pursuant to section 7–1–103. See White and Summers, *supra*, § 2–11, at 109. In *Richard Kelley Chevrolet Co., Inc. v. Seibold*, 363 So.2d 989, 993 (Ala.Civ.App.1978), the court formulated a concise statement of the fraud exception:

> On the issues of whether a contract is void, voidable or reformable because of illegality, fraud, mistake or any other reason and whether the parties assented to a particular writing as the complete and accurate integration of their contract, there is no parol evidence rule to be applied. On these issues no relevant evidence, parol or otherwise, is excluded. No written document is sufficient, standing alone, to determine any one of them, however long and detailed it may be. No one of these issues can be determined by mere inspection of the written document.

(citing 3 A. Corbin, Corbin on Contracts § 573, at 360 (1960)). The fraud exception, although routinely denominated as such, is not really an exception at all, inasmuch as "[a]ny application of the rule presupposes the existence of an existing, valid contract expressing the obligations of the parties." *Id.* Proof of fraud, especially fraud in the execution, which establishes a defect in the formation of the contract eliminates the need to apply the parol evidence rule. Whether the allegations of fraud in this case, where the existence of an agreement was not disputed and the defrauded party sought direct enforcement of alleged oral promises in accordance with contract law, caused the parol evidence rule to disappear completely as contended by Intercorp is a question we now must address.

Intercorp depends upon the leading case of *Nelson Realty Co. v. Darling Shop of Birmingham, Inc.*, 267 Ala. 301, 101 So.2d 78 (1957), in which the court held that, by virtue of the fraud exception, the parol evidence rule did not prevent the introduction of evidence to establish antecedent

---

**5.** "The Code does not say that this question is for the judge, but if 'completeness and exclusivity' is for the judge, then whether a writing is a final written expression as to the terms it does include would be for the judge, for the greater ordinarily includes the lesser." J. White and R. Summers, Uniform Commercial Code § 2–9, at 97 (3d ed. 1988).

oral promises not contained in a written lease. In that case, Darling Shop ("Darling"), the lessee, brought a suit seeking a declaratory judgment to clarify a lease between it and Nelson Realty ("Nelson"). Nelson answered and counterclaimed, alleging that fraud in the procurement of the lease entitled it to rescission or specific performance of oral promises allegedly made by Darling prior to the execution of the contract. The trial court dismissed Nelson's counterclaim, for the reason that antecedent verbal promises not contained in the written contract were not enforceable, either directly or indirectly. On appeal the Alabama Supreme Court reversed, forging two important principles. First, the decision established that evidence of promissory fraud was admissible under the fraud exception, a rule then not uniformly followed. See, e.g., Sweet, Promissory Fraud and the Parol Evidence Rule, 49 Calif.L.Rev. 877 (1961) (incorporated by Professor Corbin into his treatise, *supra*, § 580, at 257 (Supp.1971)). And second, the court signaled that the relief available to a defrauded party to a written agreement could include—in addition to the traditional remedies of rescission or cancellation of the instrument—specific performance of promises falsely made. *Id.* at 87. On rehearing, however, the court extended its opinion to point out that in an action at law the fraud which avoids a written contract must relate to the *execution* of the instrument, *id.*, indicating that the fraud exception might be narrower—or nonexistent—in actions seeking damages on the basis of fraud in the procurement of a contract.

Until recently, the Alabama courts have not construed *Darling Shop* so strictly. See, e.g., *Curry Motor Co., Inc. v. Hasty*, 505 So.2d 347, 351 (Ala.1987) (in affirming an award of punitive damages on basis of fraud, the court declared that "[p]arol evidence of fraud is always admissible, even though there is a completely integrated writing."); *Hall v. Integon Life Ins. Co.*, 454 So.2d 1338, 1343 (Ala.1984). However, in *Tyler v. Equitable Life Assur. Soc. of U.S.*, 512 So.2d 55 (Ala.1987), the Supreme Court of Alabama appeared to recede from

its earlier position. There, borrowers brought an action against their lender to recover a penalty fee provided for in the promissory note and charged by the lender for allowing the borrowers to prepay their mortgage. The complaint contained five counts, including fraud and misrepresentation but not breach of contract. *Id.* at 56. As a basis for the fraud and misrepresentation claims, the borrowers contended that the lender's loan officer had told them, before the loan was closed and the documents signed, that the principal could be prepaid without penalty at any time after the first year. *Id.* at 57. In affirming summary judgment in favor of the lender, the court declared,

> If a written contract exists, the rights of the parties are controlled by that contract; and parol evidence is not admissible to contradict, vary, add to, or subtract from its terms. In addition, fraud or misrepresentation cannot be predicated upon a verbal statement made before execution of a written contract when a provision in that contract contradicts the verbal statement. If a party has reason to doubt the truth of an oral representation or is informed of the truth before he acts, he may not reasonably act or rely on that representation. Reliance is one of the elements that must be proven by a party charging fraud, and the reliance must be reasonable under the circumstances.

*Id.* (citations omitted). In *Tyler*, the fraud alleged did not demonstrate a defect in the formation of the contract and the existence of an agreement was not disputed. Therefore, *Tyler* stands for the proposition that where a party to a written contract seeks to enforce an antecedent oral promise in an action for damages based upon fraud in the inducement, and the existence of an agreement is not in question, then the parol evidence rule requires that the finality of the writing be evaluated, even though breach of contract is not alleged.

In the instant case, Intercorp seeks to enforce alleged antecedent oral promises both on the basis of fraud and breach of contract. It does not assert that the fraud

allegedly committed by Pennzoil prevented the formation of a contract. Rather, Intercorp seeks to enforce, directly or indirectly, its version of the agreement by establishing terms not contained in the written instrument. *Tyler* persuades us that, despite the fraud allegations, the parol evidence rule does not lose its relevance in a case such as this. To be sure, extrinsic evidence bearing on the issues of fraud and whether the parties intended to adopt the writing as the final expression of their agreement is admissible. But the finality of the writing remains a crucial question. With respect to breach of contract, resolution of the finality issue determines whether the prior oral promises may be enforced, or whether evidence of such antecedent agreements is legally inoperative. In the fraud causes of action, the decision on the completeness of the contract affects the consideration of the element of reliance, and, as *Tyler* illustrates, in some cases the existence of an integrated writing will establish, as a matter of law, that reliance on oral representations was not reasonable, entitling a defendant to summary judgment on the fraud claims.

In a second attempt to avoid the parol evidence rule, Intercorp places great faith in *Hibbett Sporting Goods, Inc. v. Biernbaum,* 375 So.2d 431 (Ala.1979), arguing that the Alabama Supreme Court has pronounced the rule ineffective in cases such as this one. We disagree. In *Hibbett,* a non-Code case, a plurality of the Alabama Supreme Court reversed a trial judge's exclusion of testimony of an oral non-competition agreement between a lessor, a retail shopping mall, and its lessee, a sporting goods store. Their lease, which included a merger clause, did not contain a covenant not to compete, and expressly stated that "there were no 'restrictive covenants or exclusives in favor of Lessee.'" *Id.* at 434. However, "the existence of the oral agreement was not disputed." *Id.* Indeed, the defendant unequivocally acknowledged the oral agreement, testifying that the inclusion of a non-competition clause in the written lease "wouldn't be necessary." *Id.* at 435. Because there was no controversy surrounding the parties' intent that the les-

sor would refrain from renting space to another sporting goods business, the plurality held that the lease was not intended to be a complete and accurate integration of the parties' agreement, dismissing the trial court's finding to the contrary as lacking any basis in the evidence. *Id.* at 436. Thus, under Alabama contract law, "where [an] oral agreement ... is without dispute, the parol evidence rule has no field of operation." *Id.*

The significance of the lack of dispute regarding an oral agreement in *Hibbett* was underscored by *Rich Crest Homes, Inc. v. Vaughn Place, Inc.,* 485 So.2d 1123 (Ala.1986). In that case, a majority of the Alabama Supreme Court upheld the trial court's decision to exclude parol evidence of an alleged oral agreement, announcing that the plaintiff-appellant mistakenly had relied on *Hibbett.* Distinguishing its earlier decision, the court wrote,

> In *Hibbett,* the defendant admitted the oral agreement.... [The defendant in this case] does not admit the alleged oral agreement, and the contracts express on their face sufficient terms to constitute an entire contract. Each contract recites, 'this contract contains the entire agreement of the parties hereto.'

*Id.* at 1125.

Here, Pennzoil vigorously denies that it intended to be bound by its policy that distributorships be treated as exclusive. Pennzoil freely acknowledges that it informed Intercorp of this policy prior to the execution of the agreement but distinguishes between its *policy* and its *contractual intent.* It contends that while it generally treats its distributorships as being exclusive in nature—a policy made known to all potential distributors—neither Pennzoil nor Intercorp intended that the policy be part of the agreement and thus binding on Pennzoil. Moreover, Pennzoil points out that it had suggested to Intercorp that exclusive distributorships present problems under federal antitrust law, a consideration which precludes it from making exclusive contracts. Therefore, according to Pennzoil, all of the enforceable obligations were contained in the unambiguous written con-

tract, which established a "nonexclusive" distributorship. For that reason, this case is not on all fours with *Hibbett*. No Pennzoil employee testified unequivocally that the parties intended that the distributorship be exclusive. Furthermore, not only does the contract contain an unambiguous merger clause, but also Intercorp, by a letter to Pennzoil dated July 6, 1983, expressly accepted "the terms and conditions set forth in your contract...." Defendant's exhibit 39. Thus, a genuine issue exists concerning the parties' intent that the contract be a final expression of their agreement.

■ Having decided that the parol evidence rule applies in this case, allegations of fraud and the *Hibbett* decision notwithstanding, the next issue is whether the district court erroneously allowed the jury to consider Intercorp's extrinsic evidence. Pennzoil maintains that the district court improperly permitted the jury to consider such evidence to determine (1) the parties' intent to adopt the writing as the final or complete expression of their agreement and (2) the terms of the true agreement. We disagree.

Intercorp's introduction of parol evidence obligated the district court to rule on the writing's finality before allowing the jury to determine, based upon extrinsic evidence, the "true" agreement of the parties. *Hibbett Sporting Goods, Inc.*, 375 So.2d at 435–36 (Alabama law requires court, after examining written document and all parol evidence, to determine whether parties intended writing to be complete and final expression of agreement); *Port City Const. Co.*, 266 So.2d at 899. Although Pennzoil argues that the district court failed to make such a finding, we conclude that the district court found that the written contract did not represent the final and complete agreement, and the court did not subsequently instruct the jury to reconsider this issue.

Initially, we conclude that the district court found that the parties did not intend the written contract to constitute the complete agreement. The court's response to two of Pennzoil's objections to the jury charge supports our conclusion. First, Pennzoil objected to the following jury instruction: "Intercorp claims that Pennzoil maintained a duty to disclose that Pennzoil did not intend for Intercorp to have an exclusive distributorship." Pennzoil argued that this charge constitutes an improper comment on the evidence because it implies that the court believes that the parties agreed to an exclusive distributorship. The district court overruled the objection, stating, "I don't see that as anything but an exclusive distributorship." By recognizing that the parties agreed to an exclusive distributorship when the writing stated otherwise, the court implicitly found that the writing did not memorialize the entire agreement.

Second, the district judge acknowledged that the writing did not represent the parties' complete agreement when it overruled Pennzoil's objection that the jury charge improperly allowed the jury to discredit the writing. In so ruling, the court necessarily found the writing incomplete because the court refused to modify its instruction which permitted the jury to disregard any portion of the writing which conflicted with the parties' true agreement.[6]

We also reject Pennzoil's argument that the district court submitted the finality issue to the jury by instructing the jury as follows:

A contract is an agreement of the parties, whereby the parties have reached a meeting of the minds as to the material elements of the agreement. If the contract signed by Intercorp and Pennzoil does not reflect the agreement of the parties and was not intended to reflect the true agreement of the parties, then

---

6. MR. PAGE (counsel for Pennzoil): [T]he law understand [sic] UCC is ... that a written contract can only be modified by writing, if its got an integration clause in it.
MR. HAYSLIP (counsel for Intercorp): [W]e're not arguing a modification. We're

saying the contract was that way to begin with.
THE COURT: Yeah.
MR. MCWHORTER (counsel for Intercorp): We're saying the writing doesn't reflect the—
THE COURT: I'll overrule the objection.

you may disregard such portions of the writing as you deem to be in conflict with the true intent of the parties. It is for you to determine the true agreement of the parties based upon all the evidence. In this regard, you may consider the writings signed by the parties, the course of performance of the parties, and assurances made by the parties prior to and during the course of performance of the agreement, as to the meaning of the agreement. To the extent Intercorp proves by a preponderance of the evidence that the written contract was not the actual agreement of the parties, the written contract is simply untrue. The fact that the contract may contain a clause stating that the written contract contains the complete agreement of the parties would therefore also be untrue.

If Intercorp proves by a preponderance of the evidence that the written agreement does not reflect the true agreement of the parties, then you may consider the evidence produced at trial as to the true meaning of the agreement. In making your determination as to the true meaning of the agreement, then you may consider the testimony of the witnesses, the actions of the parties, and of course performance of the agreement by the parties.

Rather than delegating the finding of whether the parties intended the writing to memorialize their entire agreement, this instruction merely charges the jury to consider the extrinsic evidence and the writing in determining the parties' true agreement.

The instruction carefully explains to the jury, in the only possible way without confusing the jury, that they must consider all the evidence, but that they may credit either the writing or the parol evidence in deciding the parties' true agreement. In addition, the instruction properly charges the jury that the writing has no special authority, and therefore, the jury may disregard any part which conflicts with the true agreement.

We also decline to interpret the instruction as submitting the finality issue to the jury because the instruction does not properly submit such issue to the jury. The court unconditionally charged the jury: "It is for you to determine the true agreement of the parties based upon *all* the evidence." (Emphasis added.) This unconditional command to the jury to consider the parol evidence would infringe on the jury's duty to make a finality determination, because only if the jury found that the parties did not intend the writing as the final and complete agreement could they consider parol evidence in determining the true agreement.

In contrast, under our interpretation, the jury instruction is consistent with the district court's finding that the writing does not memorialize the agreement, and the instruction properly charges the jury to consider the parol evidence in determining the true agreement. Thus, after examining the record and the jury charge, we reject Pennzoil's claim that the district court improperly submitted the finality issue to the jury.[7]

---

7. Furthermore, we doubt that Pennzoil preserved this argument on appeal. Although Pennzoil objected to the instruction, Pennzoil's statements indicate that it objected to the instruction on a different ground. Pennzoil initially objected to the charge as follows:

> Judge, this last objection is on A, this *Hibbett Sporting Goods* charge that says, 'To the extent Intercorp proves by a preponderance of the evidence that the written contract was not the final agreement of the parties, the written contract is simply untrue,' we don't think that that's the law under the UCC. This *Hibbett Sporting Goods* is a real estate case, and the law understand [sic] UCC is as is contained in our requested charge D [sic; should read charge 8] that a written contract can only be

modified by writing, if it's got an integration clause in it.

The court rejected this objection to the jury charge and instructed the jury as quoted in the text above. After the court charged the jury, Pennzoil again objected to the instruction stating:

> Just to make sure, I was particularly—particularly thought that the charge about the true meaning of the contract, and the integration clause doesn't count, was just, under the *Hibbett Sporting Goods* case—it's one of the plaintiff's requested charges—is completely contrary to the UCC, and was an improper statement of the law.

Finally, Pennzoil's lawyer summarized Pennzoil's objection as follows:

■ Finding that the district court properly made the finality finding, we also conclude that the district court properly denied Pennzoil's directed verdict motion on the contract claim. Intercorp's extrinsic evidence provided sufficient evidence to support its interpretation of the true agreement, and therefore, the court properly submitted the true agreement issue to the jury.

In addition to the counts founded on breach of contract, Intercorp also sought damages for fraud. It asserted that Pennzoil had committed several forms of fraud, entitling it to compensatory and punitive damages. Intercorp's fraud theories included misrepresentation (both intentional and innocent), promissory fraud and fraudulent suppression. These counts were grounded primarily upon statements made by Pennzoil employees and agents alleged to have been promises or representations with respect to the inclusion of Trinidad within Intercorp's sales territory, the exclusivity of the distributorship and Intercorp's right to distribute a product marketed under the trade name of Wolf's Head, a motor oil produced by a Pennzoil division. The district court charged the jury on the elements of each of these fraud causes of action. Pennzoil maintains that in so doing the district court misstated Alabama law, thereby misleading the jury.

The Alabama legislature codified the common law of fraud at sections 6–5–100 through 6–5–104, Code of Alabama, which deal with the actions for fraud, misrepresentation and deceit. The statute defines actionable misrepresentation as follows:

Misrepresentations of a material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, or if made by mistake and innocently and acted on by the opposite party, constitute legal fraud.

§ 6–5–101. Thus, to recover damages for misrepresentation or "legal fraud," a plaintiff must show that (1) the defendant made a false representation; (2) concerning a material fact; (3) upon which the plaintiff reasonably relied; and (4) as a proximate result of such reliance, the plaintiff suffered damages. *Smith v. Reynolds Metals Co.*, 497 So.2d 93, 95 (Ala.1986).

Promissory fraud, a form of fraudulent deceit under Alabama law, is markedly different from misrepresentation, because intent to deceive is a crucial element. The rule is easy to recite that "[w]hile fraud is the false representation of a *material existing fact* inducing reliance and causing damages, ... promissory fraud requires proof that *at the time the promise was made*, there was an intent not to perform the promised act." *Green Tree Acceptance, Inc. v. Doan*, 529 So.2d 201, 206 (Ala.1988) (emphasis in original; citations omitted). But distinguishing between a representation and a promise can pose difficulties; the distinction often seems subtle. See *id.* at 208. The difference is critical, for the plaintiff pursuing a theory of promissory fraud, which requires proof of intent, bears a heavier burden than the one who relies solely on misrepresentation.

And I think our point would be that it doesn't matter whether they rely on modification or not; once you've got the signed writing, that they can't go around it with this true meaning business. But I don't want to argue it anymore because I understand your ruling.

As these objections indicate, Pennzoil argued that the court should not give a *Hibbett* instruction in this case. In *Hibbett*, the Alabama Supreme Court held that the parol evidence rule did not prohibit a court from considering an alleged antecedent oral agreement when deciding whether the parties intended a writing as the complete expression of their agreement. *Hibbett Sporting Goods v. Biernbaum*, 375 So.2d 431 (Ala.1979). Thus, by arguing that the court should not give a *Hibbett* instruction, two possible grounds exist for Pennzoil's objection: (1)

the trial court should not decide the issue or (2) evidence outside the writing cannot be considered. Because Pennzoil now argues that the court must decide this issue, Pennzoil could not have objected to the instruction on the ground that the court improperly decided this issue. Therefore, Pennzoil necessarily objected on the ground that the jury should not consider extrinsic evidence when deciding this issue.

Pennzoil's other comments support this conclusion. As stated above, Pennzoil argued that its point was "once you've got a signed writing, that they [Intercorp] can't go around it with this true meaning business." Thus, Pennzoil objected to permitting the jury to credit extrinsic evidence and abandon the writing, not to submitting the finality issue to the jury.

The statutory action for promissory fraud is found at section 6–5–104.[8]

The third fraud theory relied upon by Intercorp was that of fraudulent suppression. A cause of action for fraudulent suppression lies when a party breaches a duty to disclose a material fact. Section 6–5–102 provides:

> Suppression of a material fact which the party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case.

Section 6–5–102 does not require proof of intent to deceive. The breach of an obligation to disclose is sufficient to trigger liability for fraudulent suppression. *Chapman v. Rivers Const. Co.*, 284 Ala. 633, 227 So.2d 403, 410 (1969) ("withholding facts, material to be known, is a breach of such legal duty, regardless of intent to deceive, and is a legal fraud.").

 While the court's instructions on the several fraud causes of action were not sufficiently misleading to warrant reversal, they were somewhat confusing. For example, by simultaneously charging the separate claims for legal fraud, intentional fraud and promissory fraud, the district court risked overwhelming the jury. Moreover, the instructions blurred the subtle distinction between promises and statements of existing fact, usually referring to each as "representations." As a result, the jury could reasonably have wondered whether the difference between the two types of utterances really was important. But despite some problems, the instructions on fraud generally and on the specific claims for misrepresentation, promissory fraud and fraudulent suppression, considered as a whole, stated the law of Alabama without raising a substantial and ineradicable doubt about the jury's ability to apply the proper law.

We have carefully examined the other assignments of error raised by Pennzoil and need not detain ourselves much further with them. Pennzoil expresses dissatisfaction with the district court's handling both of the statute of frauds with respect to the cause of action for breach of contract and of the statute of limitations on the fraud claims, and it finds fault with the court's decision to grant Intercorp's motion in limine, preventing Pennzoil from presenting the testimony of Intercorp's former counsel on the basis of the attorney-client privilege. These contentions are without merit. Finally, Pennzoil argues that the district court's order denying its motion for rescission of the contract should be vacated. Because the district court found that Pennzoil had acted with "unclean hands," Pennzoil claims that the court's decision rested wholly on the jury's verdict finding Pennzoil guilty of defrauding Intercorp. We disagree for two reasons. First, we believe that the district court made an independent finding as to Pennzoil's fraudulent conduct, despite references in its opinion to the jury's verdict. Second, the court expressly stated that as a matter of law Pennzoil had failed to present sufficient evidence of the alleged kick-back scheme to render the contract invalid. Therefore, we affirm the order of the district court denying Pennzoil's motion for rescission.

## CONCLUSION

Accordingly, we affirm the jury's damages awards because we find no error in the district court's denial of Pennzoil's motions or the jury instructions. In addition, we affirm the district court's order denying Pennzoil's motion for rescission.

AFFIRMED.

HENDERSON, Senior Circuit Judge, dissenting:

While I can concur in much of the majority's opinion, the court and I part company

---

8. § 6–5–104 states:
(a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.

(b) A deceit within the meaning of this section is either:
. . . .
(4) A promise made without any intention of performing it.

on the question of whether the district court correctly applied the parol evidence rule. I would answer this question in the negative, and since "everything was wrapped in the enigma of a general verdict," I would remand the case for a new trial. See *E.L. Cheeney Co. v. Gates*, 346 F.2d 197, 200 (5th Cir.1965).

My disagreement with the majority's opinion begins with its conclusion that the district court implicitly found that the written contract was not integrated and that the parties did not intend the signed, clear and unambiguous writing as the final expression of their agreement. It ends with the court's overenthusiastic embrace of a confusing—and in my opinion erroneous—jury charge which, despite the court's attempts to finesse the issue, rather clearly compelled the jury to assume the trial court's responsibility to rule on a critical question of fact, i.e., whether, in light of the document itself, the conduct and language of the parties and all the surrounding circumstances, Intercorp and Pennzoil intended that the written contract be the final word on their agreement, displacing any oral agreement(s) to the contrary which may or may not have been reached during the negotiations leading up to the execution of the writing.

Intercorp is attempting to enforce oral promises allegedly made prior to the execution of the written agreement. The terms of this alleged antecedent verbal deal are in direct conflict with the terms contained in the contract. Intercorp's position, therefore, raises two fundamental fact questions. The obvious one is whether oral agreements were made as contended by Intercorp. But before the trier of fact can consider this problem, the other, injected by the parol evidence rule, must be settled. This preliminary issue involves the finality of the writing. The integrity of a written contract, its ability to displace earlier agreements, is a legal concept, and whether a contract was exclusive, final or neither is a question of law. However, it is a question of law that turns on a pure issue of fact, the intent of the parties. Although normally the jury would be asked to resolve a fact question such as this one, the

parol evidence rule works a change in the usual division of labor between judge and jury, reserving to the court the issue of the parties' intent. The parol evidence rule directs the court to make the factfinding first and then rule on the completeness of the contract. The judge's decision determines whether, and to what extent, parol evidence of prior understandings will be admissible to show the existence in fact of such antecedent agreements, a question which will be answered, if necessary, by the jury.

At this point it should be instructive to pause to consider what the trial court is deciding at this stage of the proceedings, and what it is not. As Professor Wigmore explained,

> There is a preliminary question for the judge to decide as to the intent of the parties, and upon this he hears evidence on both sides; his decision here, *pro* or *con*, concerns merely this question preliminary to the ruling of law. If he decides that the transaction was covered by the writing, he does not decide that the excluded negotiations did not take place, but merely that *if* they did take place they are nevertheless legally immaterial. If he decides that the transaction was not intended to be covered by the writing, he does not decide that the negotiations did take place, but merely that *if* they did, they are legally effective, and then he leaves to the jury the determination of fact whether they did take place.

> In this anomalous process, it merely happens that some of the conduct and other data which are at first resorted to *evidentially* on the question of intent are usually identical with the conduct that may subsequently be treated as legally *inoperative;* but this is a mere coincidence. The two vital differences are, first, that they are looked at for different purposes, and second, that they may be dealt with by different branches of the tribunal.

9 Wigmore on Evidence § 2430, at 99 (Chadbourn rev. 1981) (emphasis in original; footnotes omitted). It is important to emphasize that the trial court's ruling on

the question of finality is controlling as to the legal status of alleged prior agreements. Thus, while the jury may be permitted to determine whether an antecedent parol agreement was made and the terms of the oral agreement, it does so only after the judge has determined that such prior promises, if made as alleged, would constitute legally enforceable obligations.

Why the law developed a rule which alters the ordinary allocation of duties between judge and jury is a primary consideration in understanding the necessity for the parol evidence rule. In the words of one scholar,

> [W]hile special devotion to the written word may have provided the origin of the parol evidence rule, the pervasive attitude that judges provide the best protection against perjured testimony probably has been the reason for its continued viability. A distrust of the jury as a reliable mechanism for divining truth underlies the parol evidence rule. Left to their own devices, jurors may favor underdogs by relying upon alleged oral terms, thereby deciding the case in a manner calculated to avoid a perceived injustice. Jurors also may lack the sophistication needed to deal effectively with complex commercial transactions involving numerous alleged oral and written contract terms.

M. Metzger, the Parol Evidence Rule: Promissory Estoppel's Next Conquest?, 36 Vand.L.Rev. 1383, 1387–88 (1983) (footnotes omitted). Thus, the parol evidence rule both "promotes the use of, and protects, written agreements; and it gives the trial judge a polite means of keeping suspect oral evidence from the jury." G. Wallach, The Declining "Sanctity" of Written Contracts—Impact of the Uniform Commercial Code on the Parol Evidence Rule, 44 Mo.L.Rev. 651, 654 (1979). Influencing the UCC's version of the rule was the view which sees it as the "insurer that the final expression of intent governs." Metzger, *supra*, at 1390. According to this school of thought, "[c]ourts exclude oral or written terms extraneous to such a writing not because doubt exists concerning the terms' reliability, but rather because the terms are

irrelevant, since the parties superseded them in the final integrated writing." *Id.* (footnotes omitted). By design, then, the parol evidence rule interposes the judge as a special check on the jury's presumed propensity either to credit incredible testimony at the expense of a written agreement, or to enforce antecedent agreements it believes actually were made, regardless of the parties' intent that preliminary understandings be superseded by a written agreement.

As the foregoing passages indicate, the parol evidence rule's insistence that the trial court settle the issue of the contract's finality before permitting the jury to determine the existence in fact of prior oral agreements is no mere technicality. It is the essence of the rule. Whether or not the fears guarded against by the rule are well founded, the parol evidence rule remains a part of the commercial law, and Pennzoil was entitled to its protection. Yet, despite the critical significance of the finality question in this case—Pennzoil's liability rises or falls on its disposition—the majority is content to assume that the district court implicitly ruled that the parties did not intend the written contract as the final expression of their agreement. Because I believe the parol evidence rule is supposed to assure the party opposing the extraneous evidence that the court's undivided attention and special expertise are directed to resolving the conflict of whether the written contract was intended to reflect the final agreement of the parties, I would hold that the rule requires an explicit ruling on this issue.

But even if I were to agree with the court that a secret finding fulfills the trial judge's obligation, the majority does not persuade me that the district court conducted such an inquiry in this case. The majority seizes upon a couple of remarks by the district court in response to a pair of Pennzoil's objections to the jury instructions, characterizing the comments as the functional equivalent of a finding that Pennzoil and Intercorp did not intend the written contract as the last word on their deal. The statements relied upon by the majori-

ty, however, do not provide a solid basis for its conclusion.

The first example cited by the court is the following colloquy between the district judge and counsel at the charge conference:

> MR. PAGE [counsel for Pennzoil]: In Paragraph 6, 'Intercorp claims that Pennzoil maintained a duty to disclose that Pennzoil did not intend for Intercorp to have an exclusive distributorship.' There's no testimony that anybody ever said it was going to be an exclusive distributorship. The only testimony is that it was going to be exclusive in nature and that the distributor's rights would be protected. So, we would say that's an improper comment on the evidence and it's contrary to the evidence.
>
> THE COURT: I don't see that as anything but an exclusive distributorship. I don't understand the distinction you think you see. I don't see it.

The court later added, "But I think your [sic] quibbling over words when you say that the use of the term 'exclusive distributorship' doesn't belong in the charge. I overrule that." The instruction to which Pennzoil was objecting dealt with the plaintiff's theory of fraudulent concealment, explaining Intercorp's allegation that Pennzoil had a legal duty to disclose its intent that the distributorship not be exclusive. In my opinion, the majority reads too much into the judge's observations when it states that these evince the court's recognition "that the parties agreed to an exclusive distributorship when the writing stated otherwise." At 1532. Rather, the statements to me suggest that the district court saw no distinction between an agreement that the distributorship be "exclusive in nature" and an agreement that the distributorship be "exclusive," and therefore it overruled Pennzoil's objection that the use of the term "exclusive" constituted an improper comment on the evidence. Besides, whether there was in fact an antecedent oral agreement on that subject was a jury question. Moreover, even if the majority is correct in assuming that the district court's declarations betrayed its belief that such an agreement had been reached, that fact

alone would not be dispositive of whether the parties intended the antecedent oral agreement to survive the written contract. It is, of course, possible that such an agreement was made initially, but later abandoned in favor of the terms contained in the formal contract. But the majority seems to have overlooked that possibility. The danger here is that the district court did too.

The second example offered by the majority is similarly unconvincing. As explained by the court, the district judge overruled Pennzoil's objection to the "*Hibbett* charge" which stated, among other things, "To the extent Intercorp proves by a preponderance of the evidence that the written contract was not the actual agreement of the parties, the written contract is simply untrue." The majority reasons that the district court could have ruled so only if it had earlier determined the parties' intent with regard to the integration of the contract. Even if I agreed that the so-called "*Hibbett* charge" asked the jury only the permissible question of whether an earlier oral agreement actually had been made—and, as I shall explain in detail below, I do not concede that point—in the absence of an express ruling, the court's refusal to sustain Pennzoil's objection merely begs the question whether the district court had made the required finding on the completeness of the contract. The majority conveniently ignores the possibility that the district court erred by failing to make the requisite finding on the parties' intent before submitting the question of the oral agreement's existence to the jury.

Furthermore, my review of the record convinces me that the judge did not rule on the parties' intent. Instead, it appears that the district court felt it was not required to make a finding on this issue, either (1) by virtue of the fraud exception to the parol evidence rule, or (2) the exception announced by the Alabama Supreme Court in *Hibbett Sporting Goods v. Biernbaum*, 375 So.2d 431 (Ala.1979).

First, I rely upon the reason given by the district court in overruling Pennzoil's objection, early in the trial, to the introduction

of testimony about preliminary discussions respecting exclusivity. In so ruling, the district court explained, "there is a fraud allegation." ROA 7–28. However, as the majority holds, in this case the fraud exception would not relieve the court of the obligation to rule on the contract's finality. At 1530–31. Thus, the district court's misplaced reliance upon the fraud exception suggests that it may have, on that basis, failed to consider the finality issue.

Second, the district court clearly treated the *Hibbett* case as persuasive, if not controlling, authority. The language of *Hibbett* echoes throughout the relevant portion of the jury instructions, especially the charge that the written contract was "simply untrue" to the extent Intercorp proved that it was not the parties' "actual agreement."[1] In *Hibbett,* the court held that where parties to a written contract (1) do not dispute that a prior, contradictory oral agreement was made and (2) acknowledge that the contract "signed by them was not a true and complete expression of their agreement," *Hibbett,* 375 So.2d at 436, then the "parol evidence rule has no field of operation" and the trial court is precluded, as a matter of law, from finding that the contract was intended as an integration, *id.* Consequently, where a trial court in Alabama confronts the unique facts of *Hibbett,* it is relieved of the obligation to rule on the question of finality. But, as the majority acknowledges, at 1532, the facts of the instant case are not analogous to the ones in *Hibbett.* As a result, the district court was not entitled to decline to rule on the finality question as in *Hibbett.* Yet the district court's use of *Hibbett* to formulate the jury instructions suggests that it may have done exactly that.

Finally, and most important, I am unable to infer that the district court made the required finding of fact because the district court submitted this very issue to the jury. The jury was compelled to assume the court's responsibility when the court charged, "If the contract signed by Intercorp and Pennzoil does not reflect the agreement of the parties *and was not intended to reflect the true agreement of the parties,* then you may disregard such portions of the writing as you deem to be in conflict with the *true intent* of the parties." (Emphasis added.) Clearly, this instruction conditions the jury's ability to disregard the writing on its decision first that the writing was not intended as a final expression of the parties' agreement. If the district court implicitly had made this finding as required by the parol evidence rule, then why would it submit the question to the jury to reexamine?

The rest of the relevant portion of the charge supports this position as well:

It is for you to determine the *true agreement* of the parties based upon all the evidence. In this regard, you may consider the writings signed by the parties, the course of performance of the parties, and assurances made by the parties prior to and during the course of performance of the agreement, as to the meaning of the agreement. To the extent Intercorp proves by a preponderance of the evidence that the written contract was not the *actual agreement* of the parties, the written contract is simply untrue. The fact that the contract may contain a clause stating that the written contract contains the complete agreement of the parties would therefore also be untrue.

If Intercorp proves by a preponderance of the evidence that the written agreement does not reflect the *true agreement* of the parties, then you may consider the evidence produced at trial as to the *true meaning* of the agreement. (Emphasis added.)

In these confusing instructions, the jury was told that it had to determine the parties' "true intent," "true agreement," their "actual agreement" and "the true meaning

---

1. In *Hibbett,* the court wrote:

To the extent, then, that the written lease contradicts the actual agreement of the parties, it is simply untrue, and the presence in the writing of a merger clause is immaterial. Paper and ink possess no inherent power to cause statements to be true when they are actually untrue, and a provision in a writing that there exist no previous understandings or agreements not contained therein is merely a statement which actually may be untrue. *Hibbett,* 375 So.2d at 435.

of the agreement." To arrive at the "true agreement," (which means, presumably, the one which is legally enforceable) as instructed, the jury quite obviously was required to choose between the written agreement and the alleged antecedent oral agreement if it believed one was in fact made. To choose correctly, the jury necessarily was required to settle the issue of the parties' intent. How else could it conclude that the "written contract was not the actual agreement of the parties"? The true agreement charge, in my view, essentially collapsed what was supposed to be a two-part process, with the initial question of intent handled by the judge followed, if necessary, by the jury's finding as to whether prior agreements were made and if so the content of the oral understandings, into a single directive to find the "actual agreement." The jury, however, should not be forced to determine which of two conflicting agreements is enforceable. That is the judge's burden. Here, the charge imposed the court's work on the jury, which indicates to me that the court did not attempt the task itself.

Moreover, this jury instruction is a misapplication of Alabama law. Both the Code and *Hibbett* clearly assign to the trial court the job of determining whether the parties intended that a writing be a final or complete expression of their agreement. The district court erred by failing to fulfill this initial obligation, and it compounded the error by allowing the jury to find and enforce prior oral agreements under the "true agreement" rubric. The court's method ensured that "[t]he jury, rather than the trial judge, ruled on the parol evidence question, an approach that emasculates the parol evidence rule and that virtually guarantees enforcement of parol promises that the jury believed the parties actually made." Metzger, *supra*, at 1445 (footnote omitted).[2] A new trial ordinarily is warranted where the "trial court has submitted to the jury an issue not proper for its consideration."[3] *Mark Seitman &*

**2.** The author was referring to a charge which, like the one in the instant case, directed the jury to consider the parties' intent:

> Further, you are instructed that if you find from the evidence that the agreement between the parties was not intended to be contained solely in the written option and franchise agreements, but rather included additional written or oral terms, then such additional written or oral terms may be enforced and damages may be awarded for breach thereof, just as though these portions had appeared in the written agreement.

*Walker v. KFC Corp.*, 515 F.Supp. 612, 617 (S.D. Cal.1981), *modified*, 728 F.2d 1215, 1220 n. 4 (9th Cir.1984) (because circuit court of appeals set aside verdict on another ground, it did not rule on whether district court had erred by sending question of contract integration to jury).

**3.** Provided a proper and timely objection was made at trial. The majority suggests (but stops short of holding) that Pennzoil failed to preserve this issue for appeal. However, as the court acknowledges, "Pennzoil argued that the court should not give a *Hibbett* instruction in this case." At 1534 n. 7. By objecting to the *Hibbett* instruction, which loosed the jury to find the "actual agreement," Pennzoil necessarily objected to the submission of the finality question to the jury, because a search for the "true agreement," properly conducted, looks first to the intent of the parties. The instruction was, as Pennzoil complained, "completely con-trary to the UCC, and was an improper statement of the law."

Of course, Pennzoil was objecting primarily to permitting the jury to determine whether prior oral agreements were made, because the district court had not found that the written contract was not intended as a complete integration. Because Pennzoil had not received an express ruling on the finality question, I believe it was justified in objecting to the charge on the ground that it allowed the jury to credit parol evidence at the expense of the written agreement. To the extent the majority indicates that Pennzoil should have demanded a ruling on the parties' intent at the eleventh hour of the trial, I disagree. Pennzoil was entitled to that finding much earlier in the proceedings. To wait until the charge conference to issue the ruling—conduct the majority apparently approves—is a poor way to resolve a dispute over integration.

In sum, I believe that Pennzoil's objections were sufficient to preserve the issue for appeal. It seems to me that Pennzoil adequately pointed to the objectionable instructions, said that they were contrary to the UCC and an improper statement of the law and said that Intercorp should not be able to "go around" the law with the "true meaning business" by asking the jury to disregard the signed writing if they find that the parties did not intend for it to be a complete expression. Admittedly, Pennzoil's objections are neither the most artful nor precise imaginable, but they do serve to draw attention to the problem area. Based on Pennzoil's objections, I believe it would be incorrect either to (1) as-

*Associates, Inc., v. R.J. Reynolds Tobacco Co.,* 837 F.2d 1527, 1532 (11th Cir.1988). I therefore would reverse the judgment in favor of Intercorp and remand for a new trial.

sume that the trial judge knew the law and followed it; or (2) hold that Pennzoil waived the error by not objecting on the ground now urged on appeal. I am confident that the objection put the court on notice of its meaning. After all, the burning issue throughout the trial was whether the parties intended the written contract as their complete agreement.